IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:24-CT-3006-M-RJ

| | | |
|---|---|---|
| JONATHAN DAVID ENGLAND, | ) | |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM OF LAW IN** |
| | ) | **SUPPORT OF DEFENDANTS' MOTION** |
| v. | ) | **FOR SUMMARY JUDGMENT** |
| | ) | |
| O. ONYIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

NOW COME Defendants Onyia, Windley, Osborne, McCourt, and Miller ("Defendants"), by and through undersigned counsel, and submit this Memorandum in support of their Motion for Summary Judgment. In summary, Defendants' Motion should be granted because Defendants did not retaliate against Plaintiff, did not use excessive force on Plaintiff, did not failed to protect Plaintiff, did not subject Plaintiff to unconstitutional conditions of confinement, were not deliberately indifferent to any medical need of Plaintiff, and lastly Defendants are entitled to qualified immunity. Therefore, Defendants should be entitled to summary judgment on Plaintiff's claim and this action should be dismissed.

## I.      STATEMENT OF THE CASE

On January 9, 2024, Plaintiff Jonathan David England filed a Complaint in this action. [D.E. 1]. On September 27, 2024, the Court completed its frivolity review in which it dismissed some of Plaintiff's claims and retained others in the individual capacities of each of the above-referenced defendants.  [D.E. 14]. On October 25, 2025, Plaintiff filed a motion to amend his Complaint. [D.E. 18]. On December 4, 2024, the Court granted Plaintiff's motion to amend, adding Nurse Miller as a Defendant. [D.E. 20].

On February 26, 2025, Defendants filed their Answer. [D.E. 33]. On February 27, 2025, the Court issued a Scheduling Order requiring discovery to be completed by June 27, 2025, and dispositive motions to be filed by July 28, 2025. [D.E. 34].

On March 4, 2025, Sunny Frothingham, attorney with NC Prison Legal Services filed a Notice of Appearance for the limited purpose of assisting Plaintiff with discovery. [D.E. 35]. On June 24, 2025, Plaintiff's counsel filed a motion to extend the discovery and motions deadlines, which the Court granted, extending the discovery deadline to August 26, 2025, and motions deadline to September 25, 2025. [D.E. 45, D.E. 47].

On August 25, 2025, Defendants filed a motion for extension of time to extend all deadlines, which the Court granted, extending the discovery deadline through September 25, 2025, and the dispositive motions deadline through October 25, 2025. [D.E. 50, D.E. 51].

On September 25, 2025, Plaintiff filed a consent motion for extension of time to extend deadlines. [D.E. 52]. The Court granted the discovery deadline through November 10, 2025, and the dispositive motions deadline through December 11, 2025. [D.E. 53]. On October 8, 2025, after the completion of discovery, Plaintiff's counsel filed a withdrawal of representation. [D.E. 54].

Below is a chart of the allegations in Plaintiff's Complaint:

| ¶ | Date | Defendant(s) | Plaintiff's Allegations |
|---|------|--------------|-------------------------|
| 1 | 12/21/22 | Onyia, Windley, Osborne | On December 21, 2022, Defendants Onyia, Windley, and Osborne woke him up for a strip search and cell search. |
| 2 | 12/21/22 | Onyia, Windley | Alleges that he has an active PREA against Onyia and Windley |
| 3 | 12/21/22 | Onyia, Windley | Alleges that he refused the strip search if it was conducted by Onyia and/or Windley. Alleges that Windley taunted him. |

| 4 | 12/21/22 | Osborne | Alleges that Osborne opened food passage and ordered him to cuff up, which he complied, and that Osborne pulled Plaintiff's hands through the trap door causing pain. |
|---|---|---|---|
| 5 | 12/21/22 | Onyia, Windley | Alleges that when cell door opened, Onyia and Windley rushed in, shoved him into his cell, and then started punching his legs, knees and sides of stomach. |
| 6 | 12/21/22 | Onyia, Windley | Alleges that Onyia and Windley pulled down his boxes while punching him, while Onyia stated, "You told them I raped you!" referring to the active PREA. |
| 7 | 12/21/22 | Onyia, Windley, Osborne | Alleges that Osborne stood in doorway and watched while Onyia and Windley beat him while handcuffed behind his back. |
| 8 | 12/21/22 | Onyia, Windley, Osborne | Alleges that Osborne entered and started punching him on left side of head and kneed him in right side of stomach, while Onyia and Windley continued punching. |
| 9 | 12/21/22 | Not named | Alleges that Sgt. Slaczka came in and told them to stop. |
| 10 | 12/21/22 | Onyia, Windley, Osborne | Alleges that while Sgt. Slaczka escorted him out of his cell, Onyia, Windley, and Osborne searched and trashed his cell. |
| 11 | 12/21/22 | Not named | Alleges that he was left in holding cell (by Slaczka and Vanderhoof) for 3 hours while cuffed behind his back. |
| 12 | 12/21/22 | Miller | Alleges that Nurse Miller noted marks on knees, upper right buttock. He told her he had been punched in left side of head and kneed in stomach, and punched in legs, knees and side of stomach. Makes further allegations about correctional staff (Vanderhoof and Young) not named as Defendants in this action. |
| 13 | 12/21/22 | Miller | Alleges that once returned to cell, handcuffs were removed and Nurse Miller looked at his very swollen and tore up wrists and she rubbed his wrists and told him she would bring him Ibuprofen and an ice pack. |

3

| 14 | 12/24/22 | McCourt | Alleges that McCourt said, "I heard you got your ass beat," and called him a "Rat, Snitch and that I checked off from my last prison." |
|----|----------|---------|---|
| 15 | 2/13/23 | McCourt | Alleges that McCourt asked if he was still running from Onyia and Windley, and referred to the PREA as a fake and said the cameras only work when turned on, insinuating that on 12/21/22, the cameras may not have been on. |
| 16 | 2/23/23 | McCourt | Alleges that McCourt sprayed me with pepper spray for no reason when I showed him there was something wrong with my food tray. He then handed me an empty, dirty tray. He further refused to give him his snack bag and again called the PREA investigation a fake. |
| 17 | 2/27/23 | McCourt | Alleges that McCourt teased him with food tray. |
| 18 | n/a | n/a | Alleges injuries observed by Emerge Ortho. |

## II.     STATEMENT OF FACTS

**PLAINTIFF'S BACKGROUND**

On or about June 3, 2022, Plaintiff Jonathan England (OPUS 0702210), who was previously released from NCDAC custody in September 2020, was readmitted after being convicted of Habitual Felon (principal), Violation of Protective Order (principal), and Inmate Possession of Weapon (Principal) and sentenced to six to eight years incarceration. (*see* OPUS Offender Information, **Exhibit A**, attached to **Exhibit 1**, Declaration of Counsel). During his current incarceration, Plaintiff has been found guilty of 25 disciplinary infractions including, but not limited to, weapon possession, assault staff with weapon, disobey orders, lock tampering, escape, fighting, and threatening to harm/injure staff. (*see* OPUS Infractions History, **Exhibit 1-B**). At the time of the events pertaining to this action, Plaintiff was housed at Central Prison. *See*

4

Offender's External Movements, attached as **Exhibit 1-C**.

**DECEMBER 21, 2022 – P.E.R.T SEARCH (***Defendants Onyia, Windley, and Osborne***)**

It is undisputed that on December 21, 2022, Plaintiff's cell was searched. [D.E. 1 at ¶ 1]. It is further undisputed that Plaintiff initially refused to comply with the orders to submit to a search, but he ultimately submitted to handcuffs. [*Id*. at ¶ 3-4]. In fact, Plaintiff's cell was searched as part of a unit-wide P.E.R.T search conducted in Unit 1, which is where Plaintiff was housed. *See* **Exhibit 1-D** (Incident Report); *see also* Declaration of Okechukwu Onyia attached as **Exhibit 2** at ¶ 7 (hereinafter "Onyia Decl."); Declaration of Darnell Windley, attached as **Exhibit 3** at ¶ 7 (hereinafter "Windley Decl."); *and* Declaration of Joel Osborne, attached as **Exhibit 4** at ¶ 7. (hereinafter "Osborne Decl.").

P.E.R.T stands for Prison Emergency Response Team, and is a specialized group trained to deal with emergencies and other situations at a facility in need of extra manpower, including unit-wide or facility-wide searches. *Id.* at ¶ 5. During the P.E.R.T activation, Defendants Onyia, Windley, and Osborne assisted with the search, and due to Plaintiff continuously flushing his toilet when the P.E.R.T team entered the pod, his cell was among the first cells searched. *Id*. at ¶ 10.

Upon arriving to Plaintiff's cell, Sergeant Onyia ordered Plaintiff to stop flushing his toilet and to back up to the cell door. *See* Onyia Decl. & Windley Decl. at ¶ 11. When the food passage door was unlocked, Sergeant Osborne placed mechanical cuffs on Plaintiff's wrists. *Id.* When the cell door was opened, Sergeants Onyia, Windley, and Osborne entered, and Plaintiff immediately became combative and aggressive, jerking around, and refusing to comply with the search. In order to gain compliance, Plaintiff was placed on the wall, to properly secure restraints, and Plaintiff was escorted out of the unit. *Id*. at ¶ 12-13. *See also* Osborne Decl. at ¶ 11-12; *and* Windley Decl.

5

at ¶ 11-12.

Minimal force was used to gain compliance. *See* **Exhibit 1-D** (Incident Report). Plaintiff was escorted to medical by Sergeant Slaczka, who is not a named defendant in this suit, for a use of force evaluation. *See* Declaration of Kamil Slaczka, attached as **Exhibit 5** at ¶ 10 (hereinafter "Slaczka Decl."). After Plaintiff was removed from his cell, Defendants Onyia, Windley and Osborne searched his cell, per policy. *See* **Exhibit 1-D**.

During a P.E.R.T search, all inmates are to be strip searched; however, due to Plaintiff refusing the search, in general, and becoming aggressive and combative upon staff entering his cell, minimal force was necessary to gain compliance. Plaintiff was escorted from his cell and the cell search continued; however, Plaintiff was not strip searched. *See* Onyia Decl.; Windley Decl.; and Osborne Decl. at ¶ 14.

**<u>Video Footage</u>**

Plaintiff's cell is located on the upper level, at cell marked BU-206. Video footage ("C116 MSB Unit 1"), marked as **Exhibit 1-E**, shows the following:

- 07:24:26    Onyia (shaved head), Windley (hat/beard), and Osborne (tall), arrive at Plaintiff's cell.
- 07:24:55    Onyia is seen speaking with Plaintiff through cell door.
- 07:25:18    Osborne is seen speaking with Plaintiff through cell door.
- 07:26:01    Another guard arrives to unlock the food passage door.
- 07:26:33    Food passage door is opened and Onyia, Windley, and Osborne turn toward the food passage door.
- 07:26:50    Onyia, Windley, and Osborne move away from food trap passage and signal that they are ready for door to open and wait.
- 07:29:11    Onyia, Windley, and Osborne, again, signal for Plaintiff's cell door to be opened.
- 07:29:15    Plaintiff's cell door opens and Onyia, Windley, and Osborne enter.
- 07:29:24    Sgt. Slaczka (dressed in P.E.R.T shirt) walks to cell.
- 07:30:05    Plaintiff, dressed in white boxer shorts and socks, is seen exiting his cell with Sgt. Slaczka as they proceed downstairs to the lower level.

6

Defendants Onyia, Windley, and Osborne enter Plaintiff's cell together and after mere milliseconds pass before Sergeant Slaczka arrives at the cell door. In Sergeant Slaczka's statement provided in the incident report, in addition to a declaration provided herein, Sergeant Slaczka states that as he arrived at the doorway of Plaintiff's cell, Plaintiff had already been placed on the wall. At that point, Sergeant Slaczka assisted in fully restraining Plaintiff and then escorted him out of the cell. Sergeant Slaczka further provides in his declaration that at no point did he witness Sergeants Onyia, Windley or Osborne assaulting Plaintiff in any way. *See* Slaczka Decl. at ¶ 10-11. Video footage (Ex. 1-E) corroborates that there was not time for this to have even occurred.

Additionally, video footage shows that Sergeants Onyia, Windley and Osborne entered the cell at the same time, disproving Plaintiff's allegation that Sergeant Osborne stood in the doorway and watched Sergeant Onyia and Windley assault him. *See* **Exhibit 1-E**, Video Footage at 07:29:15.

NCDAC (formerly NCDPS) Chapter F, Section .1503(a) and (b) states in part:

a. The use of force shall be permissible only to the extent reasonably necessary for a proper correctional objective. This prohibition shall not be construed to mean that staff must suffer an assault upon their person before taking appropriate defensive action or that the use of force by another must be met with strictly equal force on the part of the staff.

b. An officer is authorized to use whatever degree of force that reasonably appears to be necessary to defend the officer or a third party from imminent assault. Reasonable force is authorized in order to prevent an escape or to ensure compliance with a lawful order or to protect property or to return an escapee to custody. When time and circumstances permit, a sergeant or supervisor of higher rank should be

7

present to supervise anticipated use of force or situations likely to result in use of force. An officer should attempt non-forcible methods of offender control, but only to the extent reasonably possible under the circumstances as they appear to that officer.

*See* **Exhibit 1-S**, NCDPS Chapter F .1503 (a) and (b) at p. 2-3.

## PREA ALLEGATIONS (*Defendants Onyia and Windley*)

In his Complaint, Plaintiff alleges that he refused the search on December 21, 2022, because he had an active PREA against Defendants Onyia and Windley [D.E. 1 at ¶ 2]; however, all staff involved in the search have stated that Plaintiff made no reference to PREA allegations at any time, and neither Defendant Onyia nor Windley were aware of any PREA allegations against them. *See* Onyia Decl. at ¶ 16-17; *see also* Windley Decl. at ¶ 16-17.

On November 28, 2022, prior to the events alleged in this action, Plaintiff disobeyed orders and refused to cuff up, therefore, to gain compliance, Sergeant Windley used OC pepper spray and Sergeant Onyia applied restraints. Minimal force was used to gain compliance. *See* Onyia Decl. at ¶ 18; *see also* Windley Decl. at ¶ 18; *see also* **Exhibit 1-F** (11/28/22 Incident Report). Plaintiff makes no allegations about this event in this action. Plaintiff reported no injuries and refused both decontamination and evaluation by medical staff. *See* **Exhibit 1-G** (med recs) at p. 15.

Plaintiff submitted his referenced PREA complaint on a hand-written letter dated November 28, 2022; however, due to not submitting the PREA properly, his letter was not found until over two weeks later, on December 15, 2022, on the unit manager's desk. *See* **Exhibit 1-H** (PREA internal investigation) at p. 5. It is documented that the PREA letter had remained unopened, and it was unknown when the letter had been placed on her desk. The housing unit manager opened the letter and turned it over to the PREA compliance manager immediately. *Id.*;

8

*see also* **Exhibit 1-I** (11.28.22 letter).

The day after the P.E.R.T search, on December 22, 2022, Plaintiff submitted Grievance No. 3100-2023-BBKU2-00025, alleging that on November 28, 2022, Onyia "pinched [him] on his right buttcheck," while removing restraints from his wrists, and Windley pepper sprayed him. *See* **Exhibit 1-K** (Grievance 00025). Plaintiff's grievance is in writing and speaks for itself. *Id.*

The investigation of Plaintiff's PREA allegation from November 28, 2022, did not begin until January 30, 2023, and was deemed unfounded. *See* **Exhibit 1-H** (PREA Internal Investigation) at p. 9. Several months later, on May 16, 2023, Plaintiff submitted a second PREA allegation in reference to the P.E.R.T search on December 21, 2022. *Id.* As this allegation was based on the prior PREA accusations, which were deemed unfounded/did not occur, the investigation deemed the new allegations "non-PREA." *See* **Exhibit 1-J** (12/21/22 PREA IR).

## DEFENDANT SGT. SHON MCCOURT - Allegations

On February 28, 2023, Plaintiff submitted Grievance No. 3100-2023-BBKU2-00375, in which he makes numerous allegations about Sergeant McCourt including dates of December 24, 2022, February 13, 2023, February 23, 2023, and February 27, 2023. *See* **Exhibit 1-O**, (Grievance 00375). [D.E. 1 at ¶ 14, 15, 16, and 17].

An investigation was conducted into these allegations and during a review of camera footage, it was determined that Sergeant McCourt was not in the same housing unit as Plaintiff on the dates of December 24, 2022, February 13, 2023, and February 27, 2023. *See* **Exhibit 1-P** (3/23/23 Disciplinary Investigation). Plaintiff presented no evidence to support his claims. *Id.* These allegations are fabricated.

As to February 23, 2023, Plaintiff states that "Defendant McCourt, without valid reason,

9

sprayed [him]…with pepper spray…as [he] was showing him there was something wrong with [his] food tray." He further alleges that McCourt then handed him an empty, dirty tray, refused to give him his snack bag, and called the PREA investigation a fake. [D.E. 1 at ¶ 16]. *See also* **Exhibit 1-Q** (February 23, 2023 - Incident Report).

Evidence shows that on February 23, 2023, another staff member (Officer Amerson) was passing out food trays. Plaintiff informed Officer Amerson that he was missing an item. Officer Amerson advised him that she would get him a new tray, but Plaintiff began kicking his cell door, calling Officer Amerson a "black rat bitch." Officer Amerson called for assistance and Sergeant McCourt arrived. Sergeant McCourt gave Plaintiff several directives to stop kicking his cell door, but he refused. Sgt. McCourt then deployed pepper spray into Plaintiff's cell. *See* **Exhibit 1-Q** (February 23, 2023 - Disciplinary) at p. 3. *See also See* **Exhibit 6**, Declaration of Shon McCourt (hereinafter "McCourt Decl."); *and* **Exhibit 7,** Declaration of Yadira Amerson (hereinafter "Amerson Decl.").

Per policy, Plaintiff was seen for medical screening at his cell after use of pepper spray. It is noted in Plaintiff's confidential medical records that, "offender had been upset over fruit on/not on his meal tray and lost control. Had refused to come out for regular decontamination. Was washing his face in his sink on staff arrival at his door. Noted using profuse profanity towards custody staff and particularly the staff member who sprayed him." Medical staff further observed that Plaintiff was in no visible distress. *See* **Exhibit 1-G** at p. 32.

During the disciplinary investigation for February 23, 2023, Plaintiff made a statement discussing other actions by Sergeant McCourt that had nothing to do with the matter being investigated, claiming that this was in retaliation to filing a PREA complaint. *See* **Exhibit 1-R**

(February 23, 2023 – Disciplinary Investigation) at p. 3. Plaintiff was found guilty of B24 and B25 (disobey orders and profane language). *Id.* at p. 4. Sergeant McCourt provided in his declaration that at no time has he ever retaliated against Plaintiff. *See* McCourt Decl. at ¶ 10. Additionally, Sergeant McCourt states that he was not aware of Plaintiff's PREA allegations. *Id.* at ¶ 7. Further, Sergeant Amerson provided in her declaration that she has not observed Sergeant McCourt retaliate or harass Offender England at any time. *See* Amerson Decl. at ¶ 8.

## DEFENDANT NURSE ROBIN MILLER - Allegations

In his Complaint, though not initially named as a Defendant, Plaintiff alleges that Nurse Miller "told me she would bring me something for pain and a ice pack. She left the block and never returned." [D.E. 1 at ¶ 13]. Plaintiff filed a motion for leave to amend his complaint to include Nurse Miller as a Defendant, alleging that Nurse Miller was deliberately indifferent to his serious medical needs. [D.E. 18].

Plaintiff was seen on December 21, 2022, for a use of force evaluation. Nurse Miller evaluated Plaintiff on this date and treated him per policy. *See* **Exhibit 8**, Declaration of Robin Miller (hereinafter "Miller Decl."). Nurse Miller further stated that all supplies are stored in the Unit 1 clinic where Plaintiff's assessment took place, therefore, Plaintiff received these items after the assessment was complete. *Id.* at ¶ 8.

## PLAINTIFF'S MEDICAL RECORDS

Medical records show that on December 21, 2022, Plaintiff was seen by Defendant Nurse Miller, stating, "they barged into my cell and pushed me around for no reason. My knee is killing me," and "my butt cheek is on fire." He further states that he has wrist pain from the handcuffs for being "too tight for too long." *See* **Exhibit 1-G** (Plaintiff's Medical Records) at p. 16. On exam,

11

Nurse Miller noted that Plaintiff had one mild abrasion on the left knee with full range of motion and a very minor 3-inch scratch on the outer aspect of his upper right buttock, no bruising, skin intact. His wrists showed slight redness where the cuffs made contact with the skin. When cuffs were removed, the top of the right wrist had minimal swelling. *Id.* at p. 16-18. Nurse Miller noted that Plaintiff "claims unnecessary use of force during room search, but he was vague in describing what occurred. He was angry that his room was searched." Plaintiff was given two ice packs and instructed to take two Acetaminophen 325 mg tablets, twice daily for five days. *Id.* Nurse Miller treated Plaintiff per policy on this date, and this is the only evaluation and/or encounter she had with Plaintiff while he was housed at Central Prison. *Id.* (generally). *See also* Miller Decl. at ¶ 11.

In the following two weeks, Plaintiff submitted three sick call requests with complaints of pain in his knees and wrists and requested pain medication. *Id.* at 19, 22, and 23. Plaintiff's prior prescription for Ibuprofen was refilled on January 13, 2023. *Id.* at p. 25. Plaintiff continued to complain of pain, stating that the medication was not helping. Meloxicam (Mobic) was prescribed on April 11, 2023, which Plaintiff also stated did not help. *Id.* at p. 38, 46. Of note, Plaintiff has a history of substance abuse, including, but not limited to prescription pills. *Id.* at 2.

Due to continued complaints of pain, on April 19, 2023, x-rays were obtained of his right knee which showed early arthrosis, and an x-ray of his right wrist was negative. *Id.* at p. 43, 44. Plaintiff had an MRI of both on June 21, 2023. The MRI of his right knee showed edema within the ACL which was reflective of a sprain, tendinosis and a low-grade insertional tear of quadriceps tendon, and patellofemoral chondrosis. The MRI of his right wrist showed no acute findings but showed a ganglion cyst along the radial and volar aspect of the wrist. *Id.* at p 52, 54. Of note, Plaintiff transferred out of Central Prison on June 23, 2023. *See* **Exhibit 1-C**.

Plaintiff was seen by Emerge Ortho on July 7, 2023, for a consultation on his right knee. It is noted on assessment that Plaintiff has right knee pain with quadriceps tendinosis and patellofemoral chondromalacia and an old, healed ACL sprain. Non-surgical treatment was advised, including non-steroidal anti-inflammatory medication and activity modification to allow time to fully heal. *See* **Exhibit 1-G** at p. 61.

Plaintiff was seen on July 18, 2023, by Emerge Ortho for his right wrist, where is it noted that while he has a ganglion cyst, this is not in the area where he reports pain. It is further noted that Plaintiff could be having some synovitis and inflammation in his wrist joint and was given a steroid injection and provided a wrist splint for protection and comfort. *Id.* at p. 69. He followed up with Emerge Ortho on September 25, 2023, where he reported that the injection helped, but the pain was now reoccurring. He was given a repeat steroid injection in his right wrist. *Id.* at p. 77.

**<u>Subsequent Injuries</u>**

On October 18, 2023, Plaintiff had an incident involving other correctional staff where he allegedly sustained injuries to both wrists and his left elbow after slipping and falling in his flooded cell. *Id.* at p. 87-93. After this, he was again followed up with Emerge Ortho on February 7, 2024, where he reported numbness and tingling to this right hand; however, there is no note that Plaintiff informed the provider that he had any reinjury. *Id.* at p. 102. An EMG study was conducted on his right wrist in May 2024 showing that Plaintiff has carpal tunnel syndrome in the right upper extremity. *Id.* at p. 118.

On February 14, 2024, Plaintiff was involved in yet another incident involving other correctional staff, where he reinjured his right knee. *Id.* at p. 108. Plaintiff refused his medical trip to Emerge Ortho on May 9, 2024. *Id.* at p. 123. After this, Plaintiff makes no more complaints

concerning any alleged injuries. *Id.*

### III.  <u>STANDARD OF REVIEW</u>

Courts should grant summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In determining whether a genuine issue of material fact exists, a court must view the facts, and draw all reasonable inferences therefrom, in the light most favorable to the nonmoving party. *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011). "If the record, so viewed, gives rise to genuine factual disputes . . . then those questions must be resolved by a jury, not on summary judgment." *Dean v. Jones*, 984 F.3d 295, 301-02 (4th Cir. 2021). "A dispute is 'genuine' for these purposes so long as a reasonable jury could resolve it in [the nonmovant's] favor." *Id.* at 302.

The party moving for summary judgment has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Thereafter, the burden shifts to the nonmoving party, who "must set forth specific facts showing that there is a genuine issue for trial." *Id.* At 322 n.3.

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 323. Courts have an affirmative duty to prevent factually unsupported claims from proceeding to trial. *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998).

### IV.  <u>LEGAL ARGUMENT</u>

For the reasons provided below, Defendants should be entitled to and granted summary

14

judgment.

## A. DEFENDANTS DID NOT RETALIATE AGAINST PLAINTIFF

Plaintiff fails to state a plausible retaliation claim as there is no allegation that he has been prevented from engaging in protected activity, nor is there a connection between Plaintiff's protected activity and Defendants' alleged actions. The First Amendment grants the rights to free speech and to seek redress of grievances, and these rights, to a limited extent, exist in prison. *See Martin v. Duffy*, 858 F.3d 239, 249-50 (4th Cir. 2017); *Gullet v. Wilt*, 869 F.2d 593, 1989 WL 14614, at *2 (4th Cir. 1989) (per curiam) (unpublished table decision). "To state a colorable First Amendment retaliation claim, a plaintiff must allege that (1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct." *Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020) (citation omitted).

"A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Jones v. Ashby*, Case No. 7:23CV00407, 2024 U.S. Dist. LEXIS 81234, at *6 ((W.D. VA. May 2, 2024) (quoting Constantine *v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). "To prove casual connection, the plaintiff must show that 'the defendants were aware of the plaintiff's engaging in a protected activity and show some degree of temporal proximity to suggest a causal connection.'" *Holloman v. White*, Case No. 7:24-cv-00188, 2025 U.S. Dist. LEXIS 182470, at *23 (W.D. VA. Sep. 17, 2025). To demonstrate a causal connection, "[i]t is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured-the motive must .... be a 'but-for' cause, meaning that the adverse action against the plaintiff would

15

not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 398-99 (2019); *see Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). Plaintiff is responsible for proving that his "protected conduct was a substantial or motivating factor in a prison guard's decision to take adverse action." *Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020). In order to do so, the Fourth Circuit has required plaintiffs to prove that a defendant had knowledge of the protected activity. *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998).

Bare or conclusory assertions of retaliation are insufficient to establish a retaliation claim. *Martin*, 977F.3d at 299. "In the prison context, we treat [retaliation] claims with skepticism because 'every act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (quoting *Adams*, 40 F.3d at 74).

1. DEFENDANTS ONYIA, OSBORNE AND WINDLEY

Presently, Plaintiff cannot show that Defendants Onyia, Osborne, and Windley's actions during the P.E.R.T search on December 21, 2022, had an adverse impact on the exercise of his First Amendment rights. The facts of the incident taken in their totality depict that P.E.R.T searches are done at the direction of Department management, and during said search, Plaintiff drew staff attention by repeatedly flushing his toilet, which is indicative of flushing contraband. *See* Declarations on Onyia, Windley and Osborne at ¶ 10. Plaintiff was combative and was disciplined for his non-compliance. *Id.* at ¶ 12. Following the incident, Plaintiff was not chilled or hesitant to engage in protected conduct as he filed grievances on the 6th and 30th of January for the P.E.R.T search incident. *See* **Exhibit 1-L** and **Exhibit 1-N**. Furthermore, on December 22, 2022, and January 8, 2023, Plaintiff filed grievances regarding the alleged PREA incident. *See* **Exhibit 1-K**

16

and **Exhibit 1-N**. Within his writings to these offices, Plaintiff expresses his frustration of his grievances not being timely answered, however, he continued to submit them improperly, despite being aware of the proper procedure. These grievances were received within the 90-day period and were fully exhausted. *Id.* In addition to these grievances, Plaintiff filed multiple cases with the Industrial Commission[1], as well as the present action. Ultimately, Plaintiff cannot show that any alleged action by Defendants Oniya and Windley had an adverse impact on the exercise of his First Amendment rights as he has exercised his rights repeatedly. Inasmuch, Plaintiff fails to meet the second element of his retaliation claim against these Defendants.

However, if this Court decides that Plaintiff has satisfied the second element, he cannot satisfy the third as there is no causal connection between Defendants alleged conduct and Plaintiff's protected activity. "There is no causal connection if the alleged retaliatory actions were initiated before the protected activity." *See Newby v. Whitman*, 340 F. Supp. 2d 637, 660-661 (2004). On December 21, 2022, there was a unit-wide P.E.R.T search. The search was not due to any alleged protected activity by Plaintiff, but instead, for valid penological and security reasons. Plaintiff improperly submitted his PREA complaint, and as a result, the investigation did not begin until January 24, 2023. *See* **Exhibit H**. Due to these delays, inadvertently caused by Plaintiff himself, at the time of the P.E.R.T search on December 21, 2022, Sergeants Onyia and Windley were not aware of the PREA allegations against them as they had not been interviewed as part of the PREA investigation yet. *Id.*; *See also* Declarations of Oniya and Windley at ¶ 17. Further, Defendant Osborne was not involved in or aware of Plaintiff's PREA Complaint. *See* Osborne

---

[1] Plaintiff has filed two complaints with the North Carolina Industrial Commission in relation to these claims, which are currently pending; *See* TA-33049, *Jonathan David England v. N.C. Dept. of Adult Corr.*; and TA-33050, *Jonathan David England v. N.C. Dept. of Adult Corr.*

Decl. at ¶ 17. Officer Osborne did not take retaliatory action towards Plaintiff on December 21, 2022, and was not alleged to have engaged in conduct on any other date.

Ultimately, the officers were not aware that Plaintiff filed a PREA Complaint, which is why they were permitted to be a part of the P.E.R.T search of Plaintiff's cell, and why there is no causal relationship between the December 21, 2022, incident and Plaintiff's submission of a PREA Complaint.

2. SERGEANT MCCOURT

Plaintiff alleges that Sergeant McCourt called him names and harassed him with his food trays over the PREA allegations made against Onyia and Windley on December 24, 2022, February 13, 2023, and February 27, 2023, and that on February 23, 2023, Sergeant McCourt pepper sprayed him without valid reason. *See* [D.E. 1 at ¶ 14-17]. With respect to the allegations against Sergeant McCourt, Plaintiff submitted a grievance on February 28, 2023, however, after an investigation, it was determined that Sergeant McCourt was not even in the same unit as Plaintiff during the times alleged, other than February 23, 2023. *See* **Exhibit 1-O** (Grievance No. 3100-2023-BBKU2-00375). *See also* **Exhibit 1-P** (March 2023 Disciplinary Investigation).

Regarding Sergeant McCourt, he was not working on the unit at any time pertinent to Plaintiff's allegations with exception of February 23, 2023. The use of force incident on February 23, 2023, was not retaliation as Sergeant McCourt administered OC pepper spray through Plaintiff's food passage trap after Plaintiff verbally assaulted another officer and refused direct orders. *See* McCourt Decl. at ¶ 5-6. Further, Sergeant McCourt was not a part of and did not have any knowledge of the PREA Complaint filed by Plaintiff, which prevents Plaintiff from establishing a causal relationship between his protected activity and Sergeant McCourt's alleged

18

conduct. *Id* at ¶ 7.

In summation, no Defendant named in Plaintiff's Complaint engaged in retaliation against Plaintiff for his attempt to submit a PREA complaint.

**B. DEFENDANTS ONYIA, WINDLEY, OSBORNE, AND MCCOURT DID NOT USE EXCESSIVE FORCE**

When an inmate brings an excessive force claim against prison officers, the court must determine "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. "*Whitley v. Albers*, 475 U.S. 312, 320-321 (1986). "Eighth Amendment analysis necessitates inquiry as to whether the prison officials acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered, or injury inflicted on the inmate was sufficiently serious (objective component)." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996).

In the analysis of the subjective component, courts must determine whether the defendant showed "wantonness in the infliction of pain." *Whitley*, 475 U.S. at 322. To aid in that determination, courts should consider "(1) the necessity for the application of force; (2) the relationship between the need for force and the amount of force used; (3) the extent of the injury actually inflicted; (4) the extent of the threat to the safety of the staff and prisoners, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) the efforts taken by the officials, if any, to temper the severity of the force applied." *Id.* at 321.

Further, Courts must give "wide-ranging deference" to the execution of policies and practices that in the judgment of the prison officials are necessary "to preserve internal order and discipline and to maintain institutional security." *Id.* at 321-22. The Supreme Court has recognized

19

that prison officials work in an environment where there is an ever-present potential for violence and unrest, and that courts should not substitute their judgment for that of the officials who must make a choice at the moment when the application of force is needed. *Id.* The deference owed to prison administrators extends to "prophylactic or preventive measures intended to reduce the incidence of . . . breaches of prison discipline." *Id.* at 322.

P.E.R.T searches are conducted when prison management identifies a particular area within the institution where safety concerns exist. *See* Onyia, Osborne, Windley, and Slaczka Decl. at ¶ 6. When an offender fails to follow orders or procedures during a P.E.R.T search they are restrained/cuffed and taken to the restrictive housing unit, as to prevent further incident. *Id* at ¶ 8. DAC policy permits officers to use force for a proper correctional objective and to ensure compliance with a lawful order. *See* **Exhibit 1-S**. On 21 December 2022, once mechanical restraints were placed on the Plaintiff he immediately started jerking away from the officers, was combative and aggressive and did not follow orders. *See* Oniya & Windley Decl. at ¶ 12. At this point Defendants Onyia and Windley entered Plaintiff's cell to properly secure his restraints and for compliance purposes. *See* Onyia, Windley, & Osborne Decl. at ¶ 14. Plaintiff alleges that he was punched and kneed upon his body, however this false, Defendants entered only after he refused to comply with lawful and standard orders. Surveillance video shows that the entire unit is undergoing the same P.E.R.T search with all offenders being handcuffed behind their backs. *See* **Exhibit 1-E**. The pertinent Defendants were in Plaintiff's cell approximately thirty seconds attempting to get him to comply with orders, and during this time Plaintiff was not struck, punched, or kneed. *See* Onyia and Windley Decl. at ¶ 15; and Osborne Decl. at ¶ 15-16. Ultimately, Plaintiff was escorted out of the unit by Sergeant Slaczka. *See* Slaczka Decl. at ¶ 10. Video footage also

20

shows Plaintiff being escorted from his cell and there are no visible injuries. Plaintiff walks normally and without assistance. *See* **Exhibit 1-E**. Additionally, during this interaction, Plaintiff's PREA allegations are not mentioned. *See* Oniya, Windley & Osborne Decl. at ¶ 18. After Plaintiff was escorted from the unit Defendants Onyia, Osborne, and Windley had no further contact with Plaintiff that day, and Plaintiff does not allege such. [D.E. 1], *See* Oniya, Windley Decl. at ¶ 20.

As a result, Defendants Onyia, Windley, and Osborne respectfully asks this Court to dismiss Plaintiff's excessive force claim.

### C. DEFENDANTS DID NOT FAIL TO PROTECT PLAINTIFF, AS SUCH, PLAINTIFF CANNOT SATSIFY THE REQUIRED ELEMENTS

Generally, "a law officer may incur § 1983 liability only through affirmative misconduct." *Randall v. Prince George's Cnty.*, 302 F.3d 188, 202 (4th Cir. 2002). However, our Court of Appeals has recognized liability when a plaintiff demonstrates that a "bystanding" officer "(1) knows that a fellow officer is violating an individual's constitutional rights, (2) has a reasonable opportunity to prevent the harm, and (3) chooses not to act." *Id.* at 204 (footnote omitted); *see also Quinn v. Zerkle*, 111 F.4th 281, 295 (4th Cir. 2024); *Brooks v. Johnson*, 924 F.3d 104, 110 (4th Cir. 2019).

Presently, there are four accounts of the December 21, 2022, cell search, that maintain that Plaintiff's PREA complaint was not mentioned, and further, that Plaintiff was not struck, punched, or kneed upon his body by any correctional officer. *See* Osborne Decl. at ¶ 16, Onyia and Windley Decl. at ¶ 15. Plaintiff, in his Complaint, mentions that Seargent Slaczka, who is not a party to this action, was present and escorted him from his cell. [D.E. 1]. The video shows that Sergeant Slaczka arrives at the cell less than one second after Sergeants Onyia, Osborne, and Windley, and once he

does, the Plaintiff was already being placed on the wall pursuant to protocol. *See* Slaczka Decl. ¶ 10. This is after Plaintiff was heard being loud and disruptive. *Id* at ¶ 9. Finally, Sergeant Slaczka provides that at no point did he observe plaintiff being struck nor did he instruct any officer to stop assaulting Plaintiff. *Id* at 11. This aligns with the Officers Onyia, Windley, and Osborne who maintain that the only force utilized was pursuant to protocol as Plaintiff was failing to comply with lawful orders. *See* Onyia, Osborne, Windley Decl. at ¶ 12. Therefore, Officers Onyia, Windley, and Osborne, cannot be liable under the theory of bystander liability as Plaintiff's constitutional rights were not being violated.

## D. DEFENDANTS ONYIA, WINDLEY, OSBORNE, AND MILLER WERE NOT DELIBERATELY INDIFFERENT TO THE MEDICAL NEEDS OF PLAINTIFF

Regarding prisoner's complaints about medical care, the Supreme Court held that "society does not expect that prisoners will have unqualified access to health care." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Under the Eighth Amendment, deliberate indifference to a serious medical need requires proof (1) that, objectively, the prisoner was suffering from a serious medical need and (2) that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was provided. *See Farmer*, 511 U.S. at 837. "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"

Generally, "deliberate indifference is a very high standard – a showing of mere negligence will not meet it." *Parrish*, 372 F.3d at 302. "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent,

22

inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990). Ultimately, "[a] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eight Amendment. *Moon v. Mueller*, C/A No.: 1:12-1225-TMC-SVH, 2013 U.S. Dist. LEXIS 75370, at *8 (4th Cir. Mar. 11, 2013); (quoting *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)). Additionally, the 4th Circuit has previously held that a prisoner's disagreement with medical personnel over the course of their treatment does not create a cause of action for deliberate indifference to a serious medical need. *Totten v. Johnson*, 1:08cv1299(CMH/TRJ), 2009 U.S. Dist. LEXIS 129958, at *6 (4th Cir. Jan. 16, 2009).

"Personal capacity suits impose personal liability on a government officials *for actions he takes* under color of state law." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (emphasis added). "Liability will only lie where it is affirmatively shown that the official charged *acted personally* in the deprivation of plaintiffs' rights. The doctrine of *respondeat superior* has no application under this section." *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (emphasis added); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1428-29 (7th Cir. 1996) (held that *respondeat superior* is not applicable and that "the official must actually have participated in the constitutional wrongdoing").

1. ONYIA, WINDLEY, OSBORNE

Defendants listed in this section's heading were not deliberately indifferent to the medical needs of Plaintiff. These officers, as provided above in the "Video" section of the "Statement of Facts," were exposed to Plaintiff for approximately thirty (30) seconds, where Plaintiff was disobeying orders and resisting officers. *See* **Exhibit 1-E**, Onyia, Osborne, Windley Decl. at ¶ 12.

23

After officers gained control of Plaintiff, he was escorted to the medical unit by an officer (Slaczka) who is not listed as a party in this action. *See* [D.E. 1]. Officers Onyia, Windley, and Osborne had no further interaction with Plaintiff and there is no allegation that they did. *Id.* Therefore, Plaintiff cannot prove that he was suffering from a serious medical need, or that Officers Oniya, Windley, and Osborne were aware of any need for medical attention.

    2. <u>NURSE MILLER</u>

Pertaining to Nurse Miller, she cannot be liable for a deliberate indifference action as Plaintiff was not suffering from a serious medical need, and even if a serious medical need is deemed to have existed, Nurse Miller provided treatment to him. While, treating Plaintiff for the three complaints that he had (knee, buttocks, and wrists), Plaintiff provided that on scale of one to ten that the pain for his injuries was at a four (4) for his knee and buttocks, and a six (6) for his wrists. *See* **Exhibit 1-G**. Plaintiff did not give any indication that he could not walk or need emergent treatment. Further, Nurse Miller treated Plaintiff by taking detailed notes about the Plaintiff's alleged injuries, noting abrasions and swelling, and providing him with acetaminophen and two cold packs. *Id.* Furthermore, outside Nurse Miller's treatment of Plaintiff on December 21, 2022, she did not see the Plaintiff any further. *See* Declaration Miller. Ultimately, Nurse Miller treated Plaintiff's non-serious medical needs on the lone occasion that she interacted with him pertaining the claims of this suit.

**E. CONDITIONS OF CONFINEMENT**

To prove a conditions of confinement claim, Plaintiff must "show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993). Regarding the first

objective prong, "unlike an excessive force claim that may be sustainable where only a de minimis injury resulted, '[o]nly an extreme deprivation, that is, a serious or significant physical or emotional injury resulting from the challenged conditions, or substantial risk thereof, will satisfy the objective component of an Eighth Amendment claim challenging the conditions of confinement.'" *Parker v. Stevenson*, 625 Fed. Appx. 196, 200 (4th Cir. 2015) (quoting *De'onta v. Johnson*, 708 F.3d 520, 525 (4th Cir. 2013)). Furthermore, courts within the Fourth Circuit have adopted the Second Circuit's standard stating that a "condition is sufficiently serious to merit constitutional protection if it is a condition or urgency, one that may produce death, degeneration, or extreme pain." *See Badu v. Broadwell*, 2014 WL 12495277 at *6 n. 8 (E.D.N.C. Aug. 18, 2014) (quoting *Shydiq v. Harler*, 2012 WL 488264 at *5 (E.D. Va. Feb. 13, 2012) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994))); *Banks v. Broadwater*, 2011 WL 3164367 at *4 (D. Md. July 26, 2011); *Burns v. Medical Staff at Manning Corr. Inst.*, 2007 WL 4292781 at *3-4 (D.S.C. Dec. 5, 2007).

Presently, Plaintiff alleges that he was kept in a holding cell handcuffed for three hours. [D.E. 1]. This was after Plaintiff refused to comply with order for a P.E.R.T search. When seen by Nurse Miller it was noted that the skin on both of Plaintiff's wrist were intact, there was no bruising, and slight redness, and minimal swelling to his right wrist. *See* **Exhibit 1-G**. This does not qualify as a serious or significant physical or emotional injury. *See Robinson v. Honbarrier,* 1:22CV192, 2025 U.S. Dist. LEXIS 137111 at *25-27 (M.D.N.C Jul18, 2025) (holding neither element was met for Plaintiff being handcuffed for over 3.5 hours during a P.E.R.T search). Here, Plaintiff alleges he was handcuffed for over three hours and had minor injuries as a result, which as determined by *Robinson*, is not sufficient for a viable conditions of confinement claim.

25

Additionally, after being escorted from the unit Defendants Onyia and Windley did not have any further interaction with Plaintiff and played no part in where he was escorted to and the use of restraints once he left the housing unit as Sergeant Slaczka was the officer who ultimately applied the full restraints to Plaintiff. *See* Onyia and Windley Decl. at ¶ 20, Slaczka Decl. at ¶ 10.

As a result, Plaintiff's condition of confinement claim should be dismissed.

## F.  ALTERNATIVELY, DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

Defendants should receive qualified immunity because Plaintiff has failed to show that Defendants violated any of his clearly established rights.  The doctrine of qualified immunity protects government officials from actions for civil damages as long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violated the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  "[I]t is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526, (1985).  "The test for qualified immunity is a two-pronged inquiry. The court must determine, in no particular order, (1) whether a constitutional right has been violated on the facts alleged and (2) whether the right was clearly established at the time so that it would be clear to an objectively reasonable officer that his conduct violated that right." *Adams v. Parsons*, 2011 WL 1464856 at *4 (S.D. W.Va. April 15, 2011) (citing *Saucier v. Katz,* 533 U.S. 194, 200–02 (2001)).

There has been no constitutional right violated. Throughout this action, Plaintiff has made false and conclusory statements not supported by anything other than his own statements. Plaintiff failed to properly submit his PREA complaint, inadvertently causing a delay in the investigation,

26

leading to the allegations in his Complaint. Defendants did not engage in a retaliatory campaign against nor use excessive force on Plaintiff. Though, not clearly seen on surveillance video, the time elapsed between Defendants Onyia, Windley, and Osborne entering Plaintiff's cell and the time Plaintiff is escorted out of his cell by another officer was only 50 seconds, and witnessed by other correctional staff involved, but not named as defendants in this case.

Further, Defendant McCourt did not retaliate against Plaintiff. In the February 23, 2023, incident, another officer observed Plaintiff's behavior and called for Sergeant McCourt. Plaintiff continued the behavior and refused direct orders to stop. As Plaintiff was involved in disorderly conduct, Sergeant McCourt's actions were not retaliatory and violated no constitutional right. Additionally, a right is not clearly established at any point during the instances alleged in Plaintiff's Complaint. Plaintiff himself was involved in discipline worthy behavior and Defendants responded appropriately. Nurse Miller's only interaction with Plaintiff was on 21 December 2022, and during said interaction she took adequate notes and treated Plaintiff's alleged injuries.

## V.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment should be granted. This the 2nd day of February 2026.

**JEFF JACKSON**
**ATTORNEY GENERAL**

/s/ Clarence Turpin, V
Clarence Turpin, V
Assistant Attorney General
N.C. State Bar No. 53926
N.C. Department of Justice
Public Safety Section
P.O. Box 629

Raleigh, NC  27602-0629
Telephone: (919) 716-6431
Facsimile: (919) 716-6761
E-mail:  cturpin@ncdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this day, I electronically filed the foregoing with the Clerk of the Court utilizing the CM/ECF system, and I further hereby certify that I mailed this document to the following non-CM/ECF participant, first-class United States Mail, postage prepaid, addressed as follows:

Jonathan England
OPUS 0702210
Alexander Correctional Institution
633 Old Landfill Rd.
Taylorsville, NC 28681
PRO SE

This the 2nd day of February 2026.

/s/ Clarence Turpin, V
Clarence Turpin, V
Assistant Attorney General